Ellen C. JONES, Executrix of the Estate of Dennis M. Jones, Plaintiff,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY, Defendant and Third–Party Plaintiff,

v.

Terry L. LOTHAMER, d/b/a Insurance and Risk Management, Third–Party Defendant.

No. 1:92–CV–135.

United States District Court, W.D. Michigan, Southern Division.

March 19, 1993.

Henry L. Guikema, Grand Rapids, MI, for plaintiff.

David H. Oermann, Detroit, MI, for defendant and third-party plaintiff.

William S. Farr, Grand Rapids, MI, for third-party defendant.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This case presents fundamentally a breach of contract action to recover benefits under a policy of life insurance. Defendant Jackson National Life Insurance Company has denied liability, asserting the contract of insurance is void because the insured's health changed prior to delivery of the policy and because the application for insurance contained material misrepresentations. Further, defendant has filed a third-party complaint against its agent, Terry L. Lothamer, alleging that he is liable, under various contract and tort theories, for the amount of any benefits it may be compelled to pay. This court has jurisdiction by virtue of the parties' diversity of citizenship. It has been determined that Michigan law governs adjudication of the claims contained in both complaints. Now before the Court are the parties' cross-motions for summary judgment.

## I. SUMMARY OF FACTS

Dennis M. Jones died on March 15, 1991, at the age of 45. He is survived by his wife, Ellen C. Jones, plaintiff herein, and three children. He had worked as an insurance

agent and was most recently employed by Insurance and Risk Management, Inc., of Muncie, Indiana, as a producer of commercial lines insurance. During the summer of 1990, he had consulted with his friend and co-worker, insurance agent Terry L. Lothamer, about purchasing additional life insurance. Lothamer served as an independent agent of Jackson National Life Insurance Co. ("Jackson National"), authorized to solicit applications for insurance and deliver policies. Upon Lothamer's suggestion, Jones applied for a $500,000 standard policy with Jackson National. Jones completed the application on July 25 and 26, 1990. The application was mailed to Jackson National on July 26 or 27.

In relevant part, the application revealed that Jones had a hiatal hernia and was taking the prescription medication Zantac. In response to the question whether he had had any diagnostic tests during the past five years, Jones disclosed only that he had had a urine test in April 1990. In fact, he had also undergone an upper gastrointestinal tract x-ray examination on April 16, 1990. The upper g.i. x-ray revealed the existence of the hiatal hernia and stricture, or narrowing, of the esophagus. The results of the upper g.i. exam had been communicated to Jones by telephone the next day.

On July 27, 1990, one day after completing the application, Jones kept an appointment with his family doctor, Joseph Pippenger, M.D., for treatment of continuing heartburn and swallowing problems, the symptoms which had precipitated the upper g.i. exam. Dr. Pippenger appears to have believed these symptoms and the stricture of the esophagus were related to the hiatal hernia, but recommended that Jones undergo further diagnostic testing. Pursuant to this recommendation, Jones received notice on August 14, 1990, that an esophagoscopy, or endoscopy of the esophagus, had been scheduled for September 13, 1990. Jones did not apprise Jackson National of this development.

On September 7, 1990, Jackson National notified Lothamer that Jones' application had been approved. This notice was followed on September 11, 1990, by notice that the policy would be put in force upon receipt of the first annual premium payment of $1,030. Loth-amer had, in fact, mailed Jones' check in that amount to Jackson National the day before. On September 11, 1990, Jackson National mailed the policy from its office in Carmel, Indiana, to Lothamer, who received it the morning of September 13, 1990.

Jones underwent the endoscopy examination in the afternoon of September 13, 1990, at the office of Dr. Lee G. Jordan, M.D., Methodist Hospital in Indianapolis. Dr. Jordan reached the preliminary conclusion that the stricture of the esophagus was caused by a cancerous tumor. He communicated this diagnosis to Jones and arranged for a CT (computerized tomography) scan examination later that afternoon before Jones returned home. The CT scan results would enable a conclusive diagnosis.

Later that evening, after returning home, Jones began experiencing sever chest pains. He was admitted to Ball Memorial Hospital in Muncie on September 13, 1990, and transferred to Methodist Hospital on September 14, where he was found to have tumors in his stomach and esophagus. Portions of Jones' esophagus, stomach, intestine, and spleen were surgically removed on September 14 and 15, 1990. Jones was released from Methodist Hospital and returned home on October 5, 1990. In the meantime, Lothamer had delivered the Jackson National life insurance policy to him in the hospital on September 20, 1990.

Ultimately, the treatment of Jones' cancer was unsuccessful. He died on March 15, 1991. His wife filed a claim for life insurance benefits on March 25, 1991. Jackson National investigated the claim and denied it by letter dated May 23, 1991. The sole reason for the denial: that Jones had, in the September 14, 1990 cancer diagnosis, experienced a change in health prior to delivery of the policy to him, of which he did not inform Jackson National in writing. This action followed.

## II. CLAIMS PRESENTED

Plaintiff alleges in count I of the complaint that Jackson National's refusal to pay benefits under the policy constitutes a breach of contract. She claims entitlement to the sum

of $500,000 in benefits, plus statutory interest since the date of Jones' death. In count IV, plaintiff alleges Jackson National's refusal to pay benefits on a timely basis is a violation of the Uniform Trade Practices Act, M.C.L. § 500.2006, because the claim is not reasonably disputed. Based on this violation, plaintiff claims penalty interest.[1]

Jackson National, in turn, asserts third-party claims against Lothamer. Counts II, III and IV of the third-party complaint contain claims alleging that Lothamer is liable for any loss Jackson National is made to bear because of his negligence, breach of fiduciary duty and silent fraud.[2] That is, Jackson National alleges its loss, if any, will have been caused by its agent's, Lothamer's, failure to disclose Jones' changed health prior to delivery of the policy; for if Jackson National had known of Jones' cancer diagnosis on September 13, 1990, it would have withheld delivery of the policy.

## III. SUMMARY JUDGMENT STANDARD

All three parties have filed cross-motions for summary judgment in support of and in defense of the claims presented. The motions ask the Court to evaluate the factual support for the claims presented. The Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). An issue of fact is "genuine" if the evidence is such that a reasonable jury could find for the opponent. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a claim necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

## IV. PLAINTIFF'S BREACH OF CONTRACT CLAIM

■ Jackson National's defense of plaintiff's breach of contract claim is three-pronged. First, consistent with its original denial letter, Jackson National has asserted, based on the policy language, that the policy is void because Jones' health had changed, becoming different than represented in the application for insurance, prior to delivery of the policy to Jones.[3] Specifically, Jackson National appears to have understood the language as providing that the policy would not take effect unless the health of the insured,

---

1. The claims contained in counts II and III have been dismissed by order dated March 10, 1993, awarding Jackson National partial summary judgment.

2. The claims contained in counts I and V of the third-party complaint, for breach of contract and contractual indemnification, were dismissed in this Court's order dated March 10, 1993, awarding Lothamer partial summary judgment.

3. The relevant language appears in the application for insurance, which is expressly made a part of the policy:

It is agreed that .... any policy issued on this policy shall not take effect unless all of the

following conditions are met: (a) the full first premium is paid; (b) the policy is delivered to the owner during the lifetime of the persons to be covered by such policy; (c) the health of all persons to be covered by the policy remains as represented in this application....

I understand that no policy based on this application will be effective unless all of my statements and answers in this application continue to be true as of the date I receive the policy. I understand that if my health or any of my answers or statements change prior to delivery of the policy I must so inform the Company in writing.

as represented in the application, remained the same, to the knowledge of the applicant, at the time of delivery of the policy to the applicant. Because Jones learned that he had cancer, a condition not disclosed in the application, six days prior to delivery of the policy, Jackson National contends, the policy did not take effect.

Jackson National's construction of the policy language is, on its face, not unreasonable. Its denial of the claim on this basis *appears* to have merit. Under Michigan law, however, the significance of actual delivery to the consummation of an otherwise valid contract depends on the circumstances. See *Dohanyos v. Prudential Ins. Co.*, 952 F.2d 947, 950 (6th Cir.1992); *Karp Metropolitan Life Ins. Co.*, 268 Mich. 255, 258, 256 N.W. 330 (1934); *Donnelly v. Aetna Life Ins. Co.*, 222 Mich. 214, 192 N.W. 585 (1923); *Bowen v. Prudential Ins. Co.*, 178 Mich. 63, 144 N.W. 543 (1913). In *Dohanyos, supra,* the Sixth Circuit Court of Appeals held that under Michigan law, the life insurance company was estopped from relying upon the delivery requirement where the policy had been mailed by the company to its agent, but remained undelivered to the insured before he died because of the delinquency of the agent. Jackson National acknowledges that the instant policy was delivered to Lothamer on September 13, 1990, and could have been delivered to Jones before he learned of the cancer diagnosis on September 14, 1990. Accordingly, with reference to *Dohanyos, supra,* Jackson National now concedes, for purposes of the present motions, that delivery was accomplished on September 13, 1990, when the policy was received by Lothamer.[4] Assuming the policy was delivered on September 13, 1990, it became effective on that date, a day before Jones learned that his health "had changed." Thus, through its stipulation, Jackson National effectively withdraws its first defense, the defense upon which it relied in originally denying plaintiff's insurance claim.

4. This concession was made orally by counsel for Jackson National during the hearing on these motions, March 1, 1993.

5. Other answers which allegedly changed prior to Jones' receipt of the policy changed as a result

Jackson National's second and third defenses to the breach of contract claim are closely related and properly treated together. The second defense, like the first, is based on the policy language. See note 3, *supra.* Jackson National contends the policy did not take effect because not all of Jones' statements and answers in the application continued to be true as of the date he received the policy. Specifically, Jackson National contends Jones' answer to question 2c of the application had ceased to be accurate when he received the policy. That is, Jones' negative response to the question whether, in the past five years, he had been advised to have any diagnostic test which was not complete, ceased to be accurate on July 27, 1990, when Dr. Pippenger recommended the endoscopy exam, and on August 14, 1990, when Jones was informed that the exam was scheduled for September 13, 1990.[5]

The third defense asserts that Jones' answers to application questions were inaccurate and misleading in that material information was omitted. Jones answered "no" to the question whether he had been treated for disorders of the eyes, ears, nose, mouth or throat, even though he had complained of swallowing difficulties to Dr. Pippenger as early as March 21, 1990. In addition, Jones had failed to disclose the fact that he had undergone an upper g.i. exam on April 16, 1990, the results of which eventually contributed to the scheduling of the endoscopy exam. Had Jones been more completely truthful in these respects, Jackson National asserts, it would not have issued the policy before making a more careful review of his medical records. This review would have led to Jackson National's withholding of the policy pending the outcome of the endoscopy exam. Because Jones' incomplete answers thus materially affected Jackson National's acceptance of the risk, they are said to constitute material misrepresentations, which entitled Jackson National to cancellation of the policy as a matter of law. M.C.L. § 500.-

of facts learned and treatment received by him after September 13, 1990. Jackson National's concession that the policy may be deemed to have been delivered to Jones on September 13, 1990, renders these other changes immaterial.

2218; *Wiedmayer v. Midland Mutual Life Ins. Co.*, 414 Mich. 369, 375, 324 N.W.2d 752 (1982).

Plaintiff asserts these defenses were waived by Jackson National when it failed to rely on them in its original denial of the claim. The letter of Kathleen Mayotte, Claims Examiner, dated May 23, 1991, denying the claim, provides in relevant part:

> We have completed our review, and we regret to advise you that we are unable to give a favorable determination toward the claim that has been submitted under the policy and can only return the premiums that have been paid to date.
>
> The application for insurance that Mr. Jones signed on August 7, 1990, contains a provision that indicates that if he should have a change in health prior to the delivery of the policy, he must so inform the Company, in writing, of that change. During our review of his medical history and the onset of his cancer of the esophagus, we determined that he was diagnosed and hospitalized on September 14, 1990, at Methodist Hospital in Indianapolis. We also determined that the policy was not delivered until September 20, 1990.

█ The general rule under Michigan law is that a denial of liability under an insurance policy on specified grounds constitutes a waiver of other defenses. *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir.1991); *Martinek v. Firemen's Ins. Co.*, 247 Mich. 188, 191, 225 N.W. 527 (1929); *Sanborn v. Income Guaranty Co.*, 244 Mich. 99, 103–04, 221 N.W. 162 (1928); *Smith v. Mutual Fire Ins. Co.*, 234 Mich. 119, 122–23, 208 N.W. 145 (1926); *Lee v. Evergreen Regency Cooperative & Mgmt. Systems, Inc.*, 151 Mich.App. 281, 286, 390 N.W.2d 183 (1986), *lv. app. denied*, 425 Mich. 875 (1986). The rule is succinctly stated as follows:

> This court has many times held, and it must be accepted as the settled law of this State, that when a loss under an insurance policy has occurred and payment refused

for reasons stated, good faith requires that the company shall fully apprise the insured of all of the defenses it intends to rely upon, and its failure to do so is, in legal effect, a waiver, and estops it from maintaining any defenses to an action on the policy other than those of which it has thus given notice.

*Smith, supra*, 234 Mich. at 122–23, 208 N.W. 145.

Jackson National admits that it did not rely on the "changed answer" or material misrepresentation defense when it originally denied plaintiff's claim, even though it had learned of these potential defenses through its investigation beforehand. Jackson National believed that the stated reason for denial, Jones' change in health, was so significant as to render other potential reasons superfluous. See Mayotte affidavit, pp. 2–3. Yet, Jackson National argues the waiver doctrine should not be invoked because plaintiff has not shown that she would be unfairly prejudiced by allowance of defenses not asserted in the original denial.

Review of the above authorities reveals that a showing of prejudice to the insured is not a prerequisite to application of the waiver doctrine. Further, careful review of the case law cited by Jackson National reveals it to be inapposite to this case. The decisions in *Munro v. Boston Ins. Co.*, 370 Mich. 604, 122 N.W.2d 654 (1963), and *Lee v. Evergreen, supra*, rely heavily on *Ruddock v. Detroit Life Ins. Co.*, 209 Mich. 638, 177 N.W. 242 (1920). To the extent that prejudice to the insured is part of the formula in the reasoning of these cases, it applies not with respect to an insurer's *waiver* of non-asserted defenses; but rather applies with respect to *estoppel* of an insurer's attempt to raise a defense based on a condition of the policy where the insurer had, by its conduct prior to the occurrence of the loss, induced the insured to act in some way inconsistent with the condition. See *Ruddock*, 209 Mich. at 653–55, 177 N.W. 242.[6] The facts of this case

---

6. In fact, the discussion of prejudice in *Ruddock, Munro,* and *Lee,* occurs only in the context of the determination whether the "expansion of coverage" exception to the waiver doctrine applied.

Because the "expansion of coverage" exception is clearly not applicable under the present facts, see *infra,* pp. 1378–79, the issue of prejudice to

**1378**

do not support such an application of the estoppel doctrine, but do support invocation of the waiver doctrine.

■ To be sure, the terms "waiver" and "estoppel" are often used interchangeably by the courts. There is a pertinent distinction, however. A waiver is the intentional relinquishment of a known right. 16B Appleman, Insurance Law and Practice, § 9081, p. 489; 7 Couch, Couch on Insurance 2d, § 35:249, p. 381. It is predicated upon (1) knowledge of an existing right, and (2) actual intention to relinquish it, or conduct, action or inaction, warranting an inference of intention to relinquish it. *Id.;* Appleman, *supra,* § 9081, pp. 489–91. Under well-settled Michigan law, an insurer's denial of liability for specified reasons is deemed, as a matter of law, to warrant the inference that the insurer intends to relinquish its right to assert other defenses of which it has knowledge. This rule applies in Michigan irrespective of whether the insured would be prejudiced if non-asserted defenses were not deemed waived. "Estoppel," on the other hand, arises by operation of law, independent of the insurer's intent, and bars the assertion of a right by the insurer where the insured has prejudicially relied on some conduct of the insurer inconsistent with the terms of the policy. Couch, *supra,* § 35:250, pp. 381–82; Appleman, *supra,* § 9081, pp. 491–97.

Thus, while prejudice is an essential element of estoppel, it is not an essential element of waiver. Here, Jackson National, by denying plaintiff's claim for one specified reason only, notwithstanding its knowledge of other potential reasons, is deemed to have intentionally relinquished its right to later assert those other reasons, irrespective of whether plaintiff would be unfairly prejudiced thereby.

Citing the same *Ruddock* line of cases, Jackson National contends it is entitled to relief from the waiver doctrine for a second reason. *Ruddock* recognized that "the doctrine of estoppel and waiver" should not be invoked where to do so would have the effect of making the contract of insurance "cover a loss it never covered by its terms," of creating "a liability contrary to the express provisions of the contract the parties did make." 209 Mich. at 654, 177 N.W. 242. In other words, "waiver and estoppel are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom." *Lee, supra,* 151 Mich.App. at 285, 390 N.W.2d 183, quoting 1 A.L.R.3d 1139, 1144. Jackson National argues that if it is precluded from now raising its "changed answer" and material misrepresentation defenses, the effect will be to force it to cover a risk which it had not contemplated and for which it had not charged a premium.

Yet, plaintiff's claim is not dependent upon an expansion of coverage as defined by the contract. Plaintiff is suing for payment of benefits under the policy, insisting that the terms defining the scope of coverage be enforced as written. The policy purports to insure Jones' life with promise of payment of benefits within two months after proof of death, irrespective of cause, with special provision only for the case of suicide. Plaintiff does not here ask the Court to broaden coverage in contravention of the policy so as to protect her against risks not included therein or expressly excluded therefrom. Plaintiff does not ask the Court to invoke the waiver doctrine so as to preclude Jackson National's enforcement of a written exemption of coverage for death caused by cancer. There is no such exemption. The present facts are in this respect clearly distinguishable from those presented in *Ruddock, Munro,* and *Lee,* where in each case the claimant sought to vary the express policy language. For this reason, the exception to the waiver doctrine recognized in those cases does not apply.

Accordingly, the Court concludes Jackson National effectively waived its "changed answer" and material misrepresentation defenses when it failed to assert them in its original denial of coverage. Jackson National is barred from asserting them now. All three of Jackson National's defenses having thus been defeated, there remains no genuine issues of material fact. Plaintiff is enti-

the insured does not come into consideration here.

tled to summary judgment on her count I breach of contract claim.

## V. PLAINTIFF'S CLAIM FOR PENALTY INTEREST

■ Under Michigan's Uniform Trade Practices Act, the failure of an insurer to pay a claim on a timely basis is an unfair trade practice, giving rise to an interest penalty, "unless the claim is reasonably in dispute." M.C.L. § 500.2006. In count IV of her complaint, plaintiff alleges her claim for benefits has been unreasonably disputed by Jackson National.

■ The determination whether a claim was "reasonably in dispute" is a matter for the Court. *All American Life & Casualty Co. v. Oceanic Trade Alliance Council Int'l, Inc.,* 756 F.2d 474, 482 (6th Cir.1985); *Bd. of Trustees of Michigan State University v. Continental Casualty Co.,* 730 F.Supp. 1408, 1417 (W.D.Mich.1990), *appeal dismissed,* 914 F.2d 255 (6th Cir.1990). The purpose of the penalty is to penalize insurers for dilatory practices in settling meritorious claims, not to compensate a plaintiff for delay in recovering benefits to which he or she is ultimately determined to be entitled. *Id.*

The Court has devoted significant discussion to the facts and law surrounding plaintiff's claim for benefits and Jackson National's defenses thereto because resolution of all three defenses turns on rather abstruse subtleties of law. None of the defenses is based on a plainly invalid contract clause or plainly erroneous interpretation of law. *Cf. Norgan v. American Way Ins. Co.,* 188 Mich.App. 158, 164–65, 469 N.W.2d 23 (1991); *Siller v. Employers Ins. of Wausau,* 123 Mich.App. 140, 144, 333 N.W.2d 197 (1983). There is no indication that Jackson National acted unreasonably or with dilatory motive in denying plaintiff's claim.

The Court concludes, therefore, that plaintiff's claim was "reasonably in dispute." With respect to plaintiff's claim for penalty interest, there is no genuine issue as to any material fact; Jackson National is entitled to summary judgment in its favor.

## VI. JACKSON NATIONAL'S TORT CLAIMS AGAINST LOTHAMER

■ Jackson National alleges Lothamer is liable to it in the amount that it has been adjudged liable to plaintiff. Jackson National contends its loss was proximately caused by Lothamer's breach of duties he owed to Jackson National as its agent. Inasmuch as Jackson National's claims for breach of contract and contractual indemnification have been disposed of, the case against Lothamer goes forward on three tort claims only. Specifically, Lothamer is alleged to have breached his duty to exercise the ordinary care and diligence of an agent, breached his fiduciary duties to his principal, and engaged in silent fraud, by failing to disclose material changes in Jones' health of which he became aware, i.e., the cancer diagnosis and ensuing surgery, before delivering the policy to Jones. To the extent the claims are based on this theory, they are fatally undercut by Jackson National's concession that, for purposes of the present motions, delivery to Jones is deemed to have occurred on September 13, 1990, before Lothamer had knowledge of Jones' change in health.

Broadly construed, however, the tort claims may also be deemed to allege that Lothamer breached the same duties by failing to disclose his knowledge that Jones' negative answer on the application concerning pending diagnostic testing had ceased to be accurate. Under this theory, Lothamer is alleged to have learned from Jones in casual conversation on or about September 6, 1990, that Jones would be undergoing endoscopic examination on September 13, 1990. Jackson National alleges Lothamer was obliged as its agent to disclose this information before delivery of the policy. This theory of relief is not affected by Jackson National's concession concerning the date of delivery. Further consideration of the tort claims is thus premised on and limited to their assertion of this latter theory.

The parameters of Jackson National's relationship with Lothamer are defined fundamentally by the broker agreement between

them.[7] Where the parties' relationship is a creature of contract, a tort action will lie to enforce a duty owed by one to the other only "if a relation exists that would give rise to a legal duty without enforcing the contract promise itself." *Hart v. Ludwig,* 347 Mich. 559, 565, 79 N.W.2d 895 (1956); *Ulrich v. Federal Land Bank of St. Paul,* 192 Mich. App. 194, 199, 480 N.W.2d 910 (1991). Jackson National's position is that, even apart from the broker agreement, Lothamer is its agent as a matter of law under M.C.L. § 500.2220:

> Any person who shall solicit an application for insurance upon the life of another shall in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of the insurer and not the agent of the insured.

This agency relationship is alleged to have given rise to fiduciary duties in Lothamer to act diligently and with individual loyalty on behalf of his principal. Included therein, Jackson National contends, is the duty to "fully inform the principal of all facts relating to the subject matter of the agency which come to the knowledge of the agent, and which it is material for the principal to know for the protection of his interests." *School Dist. of Pontiac v. Sachse,* 274 Mich. 345, 351, 264 N.W. 396 (1936).

The statute cited does not purport to define the nature of the agency relationship declared. It does not purport to define the agent's rights, duties and responsibilities in the relationship. The statute merely establishes, as a matter of law, that a person who solicits an application for insurance is the agent of the insurer, not the applicant. It is axiomatic that the nature and scope of that agency relationship are questions of fact to be determined based on the intentions of the parties. *Birou v. Thompson–Brown Co.,* 67 Mich.App. 502, 241 N.W.2d 265 (1976), *lv. app. denied,* 397 Mich. 808 (1976). Further, where the agency relationship has been defined by unambiguous written agreement, it is for the trial judge to determine its nature and scope. *Id.*

Here, of course, the nature and scope of the parties' relationship are defined by written agreement. While the Court acknowledges that the cited statute represents an independent source for the existence of an agency relationship, the mere existence of

---

7. The broker agreement provides in relevant part:

(1) DUTIES

The Company appoints said Agent on a Non Exclusive basis for the purpose of procuring applications for insurance, delivering policies of insurance, and performing such other duties as may be required by the Company. The Agent agrees not to make delivery of a policy on behalf of the Company at any time after the Agent has knowledge, directly or indirectly, that the health of the proposed insured covered by such policy has materially changed since the time the application for such policy was made.

(2) RELATIONSHIP

The Agent shall be free to exercise his own judgment as to the persons from whom he will solicit applications and the methods, time and place of solicitation and nothing herein contained, shall be construed to create the relation of employer and employee between the Company and the Agent. Without interfering with such freedom of solicitation, the Agent shall abide by the rules of the Company for the general conduct of its business.

(3) AUTHORITY

The Agent shall have no authority, on behalf of the Company, to make, alter or discharge any contract of any of the terms, rates or conditions of the Company's policies or contracts; nor to waive the performance of any of the terms or conditions of any policy or other contract to which the Company is a party; nor to bind the Company on account of any indebtedness; nor to bring or defend any suit involving the Company; nor to receive any money payable to the order of the Company except (1) for the first premium on applications for insurance obtained by him and for (2) such premiums as he may be specifically authorized to collect. All moneys so collected by him shall, under all circumstances, be made "payable to the order of the Company" and in no other form and be promptly remitted to the Company and shall always be the property of the Company. At no time is the Agent authorized to receive premium funds payable to his personal order. Nothing contained in this agreement shall imply that this appointment and duties hereunder as well as the territory described shall in any way be exclusive to the Agent.

(4) INDEMNITY

The Agent shall indemnify and save the Company harmless against or from any and all expenses, costs, causes of action, and damages resulting from or growing out of any unauthorized act or transaction by him, his appointees, or employees.

that source, itself offering no guidance as to the form of the relationship, may not be used to enlarge the duties of the agent as defined by express agreement. This is so because the statute declares the existence of the same agency relationship whose parameters the parties sought to specifically define through their written agreement. The statute is an independent source, but does not establish or define a relation distinct from that established and defined in the parties' agreement.

Under the broker agreement, Lothamer had the duty "not to make delivery of a policy on behalf of the Company at any time after the Agent has knowledge, directly or indirectly, that the health of the proposed insured covered by such policy has materially changed since the time the application for such policy was made." Based on the statute and general principles of agency law, Jackson National asks the Court to recognize and superimpose on the parties' agreement, the duty in Lothamer, enforceable in tort, to disclose to Jackson National any information that he knew or should have known signalled a change in an application answer that might bear on Jackson National's assessment of insurability. This the Court is unwilling to do. To impose such a duty, necessarily growing out of the same relationship whose parameters the parties specifically defined by written agreement, would represent judicial rewriting of the parties' contract.

Because the duty the Court is urged to recognize arises from the same relation whose parameters the parties sought to define by contract, Jackson National's exclusive remedy is in contract. See *Hart, supra,* 347 Mich. at 565–66, 79 N.W.2d 895. The tort claims must be dismissed.[8] Third-party defendant Lothamer is entitled to summary judgment.

8. Moreover, even if Lothamer were deemed to have had a duty, enforceable in tort, to disclose information that he knew or should have known would have a bearing on the assessment of insurability, it appears the content of Jones' casual conversation with Lothamer on or about September 6, 1990, was not that sort of information. Jones simply informed Lothamer, consistent with Dr. Pippenger's opinion, that the endoscopy

## VII. CONCLUSION

In summary, the Court has concluded that plaintiff Ellen C. Jones is entitled to summary judgment on her breach of contract claim against defendant Jackson National Life Insurance Company; that Jackson National is entitled to summary judgment in its favor with respect to plaintiff's claim for penalty interest; and that third-party defendant Terry L. Lothamer is entitled to summary judgment with respect to Jackson National's third-party tort claims. In all other respects, the parties' cross-motions for summary judgment will be denied. A Judgment Order consistent with this Opinion shall issue forthwith.

## JUDGMENT

In accordance with the Opinion of this Court of even date,

**IT IS HEREBY ORDERED** that summary judgment is **AWARDED** to plaintiff Ellen C. Jones on her breach of contract claim, contained in count I of her complaint against defendant Jackson National Life Insurance Company;

**IT IS FURTHER ORDERED** that summary judgment is **AWARDED** to defendant Jackson National with respect to plaintiff's claim for penalty interest contained in count IV of her complaint; and

**IT IS FURTHER ORDERED** that summary judgment is **AWARDED** to third-party defendant Terry L. Lothamer with respect to Jackson National's tort claims against him, contained in counts II, III, and IV of the third-party complaint.

**IT IS FURTHER ORDERED** that in all other respects, the parties' cross-motions for summary judgment are **DENIED.**

exam was related to treatment of the hiatal hernia, a condition whose existence Jones had disclosed to Jackson National. See Lothamer Dep., pp. 107, 116–118. While the significance of the endoscopy exam has, in retrospect, grown substantially, there appears to be no reason why Lothamer should have reasonably anticipated such significance prior to September 13, 1990.

This Judgment Order thus disposes of all remaining claims.